**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INDEPENDENT COMMUNITY BANKERS OF AMERICA,<br>1100 New York Avenue, NW<br>Suite 500 East<br>Washington, D.C. 20005-3964,<br><br>Plaintiff,<br><br>v.<br><br>OFFICE OF THE COMPTROLLER OF THE CURRENCY,<br>400 7th Street, SW<br>Washington, D.C. 20219, and<br><br>JONATHAN V. GOULD, in his official Capacity as Comptroller of the Currency,<br>400 7th Street, SW<br>Washington, D.C. 20219,<br><br>Defendants. | ) | No. |

**COMPLAINT**

Independent Community Bankers of America ("ICBA") brings this civil action against the Office of the Comptroller of the Currency ("OCC") and Jonathan V. Gould, in his official capacity as Comptroller of the Currency, and for its claims against them states and alleges as follows:

# INTRODUCTION

1. The OCC's final rule entitled *National Bank Chartering*, 91 Fed. Reg. 9977 (Mar. 2, 2026) ("Final Rule") and Interpretive Letter No. 1176, 2021 WL 1318505 (Jan. 11, 2021) ("IL 1176"), asserts sweeping new powers to charter national trust banks that are not authorized by the National Bank Act ("NBA" or "Act"). In issuing the Final Rule and IL 1176, the OCC has far exceeded its limited statutory authority to charter trust banks that perform certain fiduciary activities. This vast expansion of power creates a gaping hole in financial regulation. Unlike traditional community banks, national trust banks fall outside much of federal financial regulation. Moreover, the national bank charter preempts many state regulations, including consumer protection laws. The Final Rule and IL 1176 thus perversely allow entities engaged in highly risky cryptocurrency and digital assets activities to enter the banking system under lightly regulated national charters rather than the more rigorously regulated traditional bank charter. The Final Rule and IL 1176 place community banks at a severe competitive disadvantage by allowing the national trust banks to offer many of the same services as community banks without complying with the same costly banking laws and regulations that apply to the community banks.

2. The Final Rule and IL 1176 also create serious risks for both consumers and the stability of the financial system. National trust banks engaged in digital assets can use the competitive advantage the rule gives them to draw in new consumers and siphon deposits out of community banks and into deposit alternatives like cryptocurrency. But

cryptocurrencies are highly volatile, prone to market crashes, cybercrime, and fraud. Consumers at national trust banks will lack many of the protections that apply to traditional banks, including deposit insurance, the separation of banking and general commerce, and prohibitions on transactions with hedge funds and other risky investments. They will also lack the safeguards that come with state banks, including consumer protection. Even more concerning, the OCC has not managed an uninsured bank receivership in nearly one hundred years. But failures of risky uninsured national trust banks could spread instability throughout the nation's financial system, including by spreading contagion risks to other traditional banks like community banks.

3. The Final Rule and IL 1176 should be vacated because they far exceed the OCC's statutory authority to charter national trust banks. The OCC misreads an amendment that Congress made to the NBA in 1978, which clarifies that a national bank "is not illegally constituted solely because its operations are or have been required by the Comptroller of the Currency to be limited to those of a trust company and activities related thereto." 12 U.S.C. § 27(a). This restrictive amendment provides the OCC authority to limit national bank charters to providing fiduciary services without taking deposits. *Nat'l State Bank of Elizabeth v. Smith*, 591 F.2d 223 (3d Cir. 1979). It does not provide the OCC sweeping authority to issue national bank charters to non-fiduciary crypto companies.

4. The OCC has authority to charter only three types of national banks: (1) banks that take deposits and engage in "the business of banking," 12 U.S.C. § 27(a); (2)

bankers' banks that exclusively provide services for other banks, *id.* § 27(b)(1); or (3) trust banks that provide fiduciary services, *id.* §§ 92a, 27(a). Under the correct reading of the NBA, the OCC has no authority to charter limited-purpose national trust banks that are neither depository nor fiduciary. And until the Trump Administration began seeking ways to allow cryptocurrency to enter the national banking system, the OCC had never attempted to do so. The OCC's sweeping claim of newfound powers in the nearly 50 year-old amendment to the NBA is contrary to both the statutory text and the major questions doctrine.

5. Under the Trump Administration, the OCC has approved or conditionally approved national trust bank charters for 21 trust banks, at least 13 of which are crypto companies, including Protego Holdings Corporation ("Protego"). These approvals violate the law because they exceed the OCC's statutory authority. They are also arbitrary and capricious, because the OCC ignored warnings from commenters, including ICBA, that Protego and other crypto companies had severely flawed risk and control functions and governance structures that lack independent oversight. They are thus at serious risk of failure if the volatile cryptocurrency market crashes. And the OCC's untested receivership framework would struggle to resolve an uninsured institution of Protego's and other crypto companies' proposed scale and complexity.

## PARTIES

6. ICBA is an association of community banks engaged in the business of banking and dedicated to channeling deposits into the neighborhoods they serve through

loans to consumers, small businesses, and the agricultural community. ICBA's members are traditional full-service banks that comply with federal regulatory requirements and are insured under the Federal Deposit Insurance Act ("FDIA"). ICBA represents thousands of community bank members located throughout the United States, with the vast majority of members holding fewer than $10 billion in assets. ICBA is dedicated to representing the interests of the community banking industry and its membership.

7. The Final Rule, IL 1176, and the approval of Protego harm ICBA's members by allowing crypto companies to compete directly with community banks by offering similar services without complying with the costly regulatory requirements that ICBA's members face. The OCC has approved or conditionally approved 21 trust banks, at least 13 of which are crypto companies, under the Final Rule and IL 1176. The OCC's approval of these companies as "national trust banks" allows them to operate nationally in competition with ICBA members, while both preempting many state-law requirements and avoiding the federal requirements for depository institutions. The Final Rule, IL 1176, and the approval therefore give these entities a competitive advantage over ICBA members.

8. For example, Member Banks A and B are small community banks, each with less than $2.5 billion in assets. The Final Rule, IL 1176, and Protego's approval will harm Member Banks A and B by requiring them to compete for customers with crypto trust banks, including Protego, on an unequal playing field, because these entities will be exempt from many of the regulatory requirements with which Member Banks A and B

must comply. Member Banks A and B each spend over $1.5 million per year on regulatory requirements, including the payment of Federal Deposit Insurance Corporation ("FDIC") assessments and compliance with Community Reinvestment Act requirements, that do not apply to Protego and other crypto trust banks.

9. Member Banks A and B will compete directly with these entities, including Protego. Protego and other crypto trust banks plan to operate nationwide, including in the same markets served by Member Banks A and B. For example, Member Banks A and B maintain wealth management divisions and/or trust departments that provide fiduciary, investment and retirement planning services. Member Bank A also provides trust services. Protego proposes to offer a variety of fiduciary and non-fiduciary activities, including custody, trading, lending, and asset administration services involving digital assets. Many of these services compete for the same customers and assets served by Member Banks A and B's wealth management and/or trust operations. To the extent customers transfer assets and financial relationships to Protego or other crypto trust banks, Member Banks A and B will lose associated deposit balances and related banking business. Such deposits are an important funding source that supports the banks' lending activities and their ability to serve the communities within their market areas.

10. This direct competition on an unequal playing field will harm Member Banks A and B. Indeed, Member Banks A and B have each already lost hundreds of thousands of dollars in business this year alone to cryptocurrency companies that the OCC has conditionally approved for national trust bank charters.

11. The OCC is an "Executive agency" as defined in 5 U.S.C. § 105 and an "agency" as defined in 5 U.S.C. § 551. The OCC is part of the U.S. Department of the Treasury and is responsible for chartering, regulating, and supervising national banks and federal savings associations.

12. Defendant Jonathan V. Gould is the Comptroller of the Currency, and he is sued in his official capacity.

## JURISDICTION AND VENUE

13. This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

14. The APA provides a cause of action for parties adversely affected by final agency action when "there is no other adequate remedy in a court." 5 U.S.C. § 704. The Final Rule (attached as Exhibit A), IL 1176 (attached as Exhibit B), and Protego's conditional approval, OCC Conditional Approval #1259 (Mar. 2021), Letter from Stephen A. Lybarger, Deputy Comptroller Licensing, OCC, to Greg Gilman, Founder & Executive Chair, Audaces Fortuna Inc., Application by Protego Trust Company, Seattle, Washington, to Convert to a National Trust Bank (Feb. 4, 2021), https://www.occ.gov/topics/charters-and-licensing/interpretations-and-decisions/2021/ca1259.pdf (attached as Exhibit C), are final agency actions, and ICBA has no other remedy available in court.

15. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this case arises under the APA.

16. This Court may award declaratory and injunctive relief under the APA, 5 U.S.C. §§ 705–706, as well as 28 U.S.C. §§ 2201–2202 and Federal Rules of Civil Procedure 57 and 65.

17. Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1) because Defendants are an agency of the United States and its principal officer in his official capacity, Plaintiff resides in this judicial district (and no real property is involved), and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### I. Statutory and Regulatory Background

#### *a. Statutory Authority to Charter National Banks*

18. The NBA empowers the OCC to charter national banks. 12 U.S.C. § 27. The OCC can charter only three types of national banks: (1) depository institutions engaged in "the business of banking," *id*. § 27(a); (2) depository institutions that are "organized to engage exclusively in providing services to or for other depository institutions," known as "banker's banks," *id*. § 27(b)(1); and (3) national trust banks engaging in fiduciary activities, *id*. § 92a.

19. First, under section 27(a), when it "appears that [a banking] association is lawfully entitled to commence the business of banking, the Comptroller shall give to such association a certificate . . . that such association is authorized to commence such

business." *Id.* § 27(a). This subsection gives the OCC authority to charter depository institutions that are engaged in "the business of banking." *Id.*

20. Second, under section 27(b), "[t]he Comptroller of the Currency may also issue a certificate of authority to commence the business of banking pursuant to this section to a national banking association which is owned exclusively . . . by other depository institutions or depository institution holding companies and is organized to engage exclusively in providing services to or for other depository institutions . . . ." *Id.* § 27(b)(1). This subsection gives the OCC authority to charter "a 'banker's bank.'" *Id.*

21. Third, 12 U.S.C. § 92a provides that the OCC can "grant by special permit to national banks" the authority to "act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located." *Id.* § 92a. The OCC can charter limited-purpose national trust banks that do not take deposits and only engage in these fiduciary operations. *Id.* §§ 27(a), 92a. These trust banks, however, are not engaged in "the business of banking" under the NBA.

22. A bank must at least take deposits to be engaged in "the business of banking" under the NBA. *Mercantile Nat. Bank v. City of New York*, 121 U.S. 138, 156 (1887) ("The business of banking, as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making

loans of money on collateral security . . ."); *see In re Prudence Co.*, 79 F.2d 77, 79 (2d Cir. 1935) ("the power to receive deposits . . . is generally recognized as the essential characteristic of a banking business"); *Indep. Bankers Ass'n of Am. v. Conover*, No. 84-1403-CIV-J-12, 1985 U.S. Dist. LEXIS 22529, at *30 (M.D. Fla. Feb. 15, 1985) ("*IBA*") ("the core of the business of banking . . . is accepting demand deposits and making commercial loans"). Apart from trust banks, "the Comptroller is without power to charter a national association which does not have the power both to accept demand deposits and to make commercial loans, because an institution that does not have these powers is not engaged in the 'business of banking' within the meaning of the NBA." *IBA*, 1985 U.S. Dist. LEXIS 22529, at *20; *see Vullo v. OCC*, 378 F. Supp. 3d 271, 292, 298 (S.D.N.Y. 2019) (similar), *vacated on other grounds sub nom. Lacewell v. OCC*, 999 F.3d 130 (2d Cir. 2021).

23. The NBA and other federal banking statutes show that "the business of banking" requires taking deposits. For example, the Act provides that "[t]he persons uniting to form [a national banking] association shall . . . make an organization certificate, which shall specifically state . . . [t]he place where its operations of discount and deposit are to be carried on." 12 U.S.C. § 22(Second). Section 27(b) similarly refers to "bank[s]" as "depository institutions." *Id.* § 27(b).

24. The Bank Holding Company Act ("BHCA") also defines "bank" to mean a bank that takes deposits insured by the FDIC, or an "institution . . . which both—(i) accepts demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties or others; and (ii) is engaged in the business of making

commercial loans." *Id.* § 1841(c)(1). Further, the Federal Reserve Act requires national banks to obtain membership in the Federal Reserve System and insurance under the Federal Deposit Insurance Act ("FDIA"). *Id*. § 222. But a national bank must be "engaged in the business of receiving deposits other than trust funds" to obtain insurance under the FDIA. *Id.* § 1815(a)(1); *see also id.* § 1813(h) (whether "insured" or "noninsured," a "bank" has "deposits").

25. The NBA was first passed in 1863. Prior to 1913, however, it did not permit national banks to act as fiduciaries, because fiduciary services are not the business of banking. *Miller v. King*, 223 U.S. 505 (1912); *see* Carl Zollmann, *Fiduciary Power of National Banks Under the Federal Reserve System*, 11 MARQ. L. REV. 39, 39–40 (1926) ("Zollmann"). State trust companies and state banks increasingly began offering fiduciary services, such as acting as trustees, executors, and guardians of estates, along with banking services. In 1913, Congress therefore authorized the Federal Reserve Board to issue a special permit to a national bank to engage in fiduciary activities. Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251 (1913). In 1918, Congress expanded national banks' fiduciary powers to allow national banks to compete on an even playing field with state banks and trust companies, which could offer customers both banking and fiduciary services. *Id.* at 42; Zollman, 11 MARQ. L. REV. at 39. In 1962, Congress gave to the OCC the power to authorize national banks to offer fiduciary services, in a provision now codified at 12 U.S.C. § 92a.

26. The 1962 legislation makes clear that section 92a provides the only authority for national trust banks, stating that "[o]n and after the date of enactment of this Act the exercise of fiduciary powers by national banks shall be subject to the provisions of this Act and the requirements of regulations issued" thereunder by the OCC. Pub. L. No. 87-722, § 2, 76 Stat. 668, 669 (1962). The OCC's regulations issued under any provision of law other than Public Law 87-722 cannot authorize a national bank to engage in fiduciary activities.

27. By 1978, the OCC had chartered several national trust banks that only offered fiduciary services, and did not take deposits. Depository Institutions Act of 1979, Hearing on H.R. 5280 before the Subcomm. on Financial Institutions Supervision, Regulation & Insurance of the H. Comm. on Banking, Finance & Urban Affairs, 96th Cong., 1st Sess. 29–30 (Sept. 25, 1979) (statement of John G. Heimann, Comptroller of the Currency).

28. A U.S. District Court held that the charter of one of these trust banks was unlawful. The OCC had approved a charter giving the trust bank authority to offer fiduciary services and activities incident to or related to its fiduciary activities, but not to take deposits. The court held that the OCC only had authority to charter an institution engaged in "the business of banking" under section 27, and that a non-depository trust bank is not engaged in "the business of banking." *Nat'l State Bank of Elizabeth v. Smith*, No. 76-1479, 1977 U.S. Dist. LEXIS 18184 (D.N.J. Sept. 16, 1977), *rev'd on other grounds*, 591 F.2d 223 (3d Cir. 1979).

29. In 1978, while that case was on appeal, Congress amended section 27(a) to add a last sentence stating that a national bank "is not illegally constituted solely because its operations are or have been required by the Comptroller of the Currency to be limited to those of a trust company and activities related thereto." Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub. L. No. 95-630, § 1504, 92 Stat. 3641, 3713 (1978).

30. This last sentence of section 27(a) states only that the OCC can impose a particular type of restriction on national bank charters, such that a bank "is not illegally constituted solely because" the OCC "limit[s]" its activities to trust company operations. 12 U.S.C. § 27(a). The amendment does not address the separate questions of what types of trust company operations the OCC can permit a national bank to perform, or under what circumstances the OCC can issue national trust bank charters to trust companies.

31. Section 92a addresses what powers of "trust companies" and related corporations the OCC can permit for national banks. *Id*. § 92a. It lists specific trust powers that the OCC can permit, then states that the OCC can permit national banks to engage "in any other fiduciary capacity" of state "trust companies" or related corporations. *Id*. § 92a(a). Section 27(a)'s reference to a national bank whose operations are "limited to those of a trust company and activities related thereto" thus refers to the fiduciary activities of trust companies and related activities set forth in section 92a.

32. The legislative history confirms that Congress amended section 27(a) in response to "litigation . . . brought by competitors of a national trust bank" and "to affirm

the old authority." 125 CONG. REC. 30,304 (Oct. 31, 1979) (statement of Sen. Stevenson). It was not intended to "confer new authority." *Id.* Rather, Congress intended the amendment to "clarif[y] the authority of the Comptroller to charter national banking associations with powers limited to the offering of trust services." *Id.* at 30,305; *see* Depository Institutions Act of 1979, Hearing on H.R. 5280 before the Subcomm. on Financial Institutions Supervision, Regulation & Insurance of the H. Comm. on Banking, Finance & Urban Affairs, 96th Cong., 1st Sess. (Sept. 25, 1979) (same).

33. The Third Circuit in *National State Bank of Elizabeth* thus held that the phrase "operations . . . limited to those of a trust company and activities related thereto" added in the amendment to section 27(a) refers to the "specially permitted fiduciary powers" under section 92a. 591 F.2d at 231. Otherwise, the Third Circuit explained, the amendment's reference to "limited" operations would be "virtually meaningless since, in most states . . . trust companies are authorized to and ordinarily do conduct the general banking business." *Id.*

34. 12 U.S.C. § 24 sets forth the corporate powers of national banks. Many of these powers apply to all national banks, including the power to sue and be sued, to make contracts, and to elect or appoint directors. *See, e.g.,* 12 U.S.C. § 24(Third), (Fourth), (Fifth). Section 24(Seventh), however, applies only to depository banks engaged in "the business of banking." It provides that such a bank has "all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by

buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes." *Id*. § 24(Seventh).

35. Taking deposits triggers significant federal statutory and regulatory requirements. A depository national bank must obtain deposit insurance. *Id*. § 222; *id.* § 1815(a)(1)-(2). It must pay ongoing assessments into the Deposit Insurance Fund. *Id*. § 1821(a)(4)(D); 12 C.F.R. § 327. It must also maintain adequate capital at a level that is determined to be "consistent with the safety and soundness of the insured depository institution." 12 U.S.C. § 3907(a)(1). And, it must comply with the quantitative liquidity and capital requirements outlined in the International Basel Accord. Basel Comm. on Banking Supervision, *Basel III: A Global Regulatory Framework for More Resilient Banks and Banking Systems* (2010). A depository national bank also is subject to the Community Reinvestment Act, which imposes numerous requirements designed to ensure that banks "serve the . . . needs of the communities in which they are chartered to do business." 12 U.S.C. § 2901(a)(1).

36. At the same time, a charter to operate as a national bank provides significant benefits. For example, many state law requirements are preempted for national banks. These include state usury laws, *id*. § 85; many state consumer financial protection laws, *id.* § 25b(b)(1)(B); or any other state law that "prevents or significantly interferes with the exercise by the national bank of its powers," *id*. National banks also are not subject to state examination and inspection requirements. *See id*. § 484; 12 C.F.R. § 7.4000.

*b. Regulatory History*

37. Before the first Trump Administration, the Federal Reserve Board, and then the OCC, long construed the authority to charter trust banks as applying only to fiduciary institutions. To ICBA's knowledge and belief, in the more than one hundred years since Congress first authorized national trust banks, prior to the Trump Administration, the OCC had never chartered a "national bank" that neither took deposits nor engaged in fiduciary activities.

38. The Federal Reserve Board regulation, "Trust Powers of National Banks," defined "bank" as "a bank or trust company," "a substantial part of the business of which consists of receiving deposits and making loans and discounts, or of exercising fiduciary powers." Federal Reserve of Dallas, Regulation F, § 104 (Feb. 5, 1951). When Congress moved the authority to charter trust banks to the OCC, the OCC recodified this regulation without substantive change. 27 Fed Reg. 9764 (Oct. 3, 1962).

39. Likewise, in 1979, an OCC letter explained that "[a] national bank is without power to carry on a general real estate business whether or not the bank has trust powers," unless it is acting "in its capacity as [a] trustee . . . or similar fiduciary position," and "conform[ing] to the standards exacted of a fiduciary." Donald R. Johnson, Director for Trust Operations. Letter No. 84. ¶ 85,159 (Apr. 3, 1979). A 1980 letter explained that "[t]he statutory phrase 'trust company' may be read as limited in meaning to trust or fiduciary operations as specified in 12 U.S.C. § 92a," citing *National State Bank of Elizabeth*, 591 F.2d 223. OCC Unpublished Interpretive Letter (Oct. 6, 1980),

https://tinyurl.com/2u6jh8be. And in 1983, another OCC letter explained that section 92a "did not mean that national banks were to be given all powers conferred on state trust institutions by the laws of the various states creating them. Rather, the Federal Reserve Board was authorized to permit national banks to exercise those *fiduciary* powers." Interpretive Letter No. 265, 1983 WL 176422, at *2 (July 14, 1983) (emphasis added) ("IL 265").

40. Similarly, the OCC's manual *Bank Supervision Process* long explained that "[t]rust banks limit their services to fiduciary activities and activities incidental to the fiduciary business." Office of the Comptroller of the Currency, *Comptroller's Handbook Examination Process: Bank Supervision Process*, at 4 (June 2018) (emphasis omitted), https://tinyurl.com/d8427h7y.

41. In 2003, the OCC promulgated a regulation providing that a "bank may be a special purpose bank that limits its activities to fiduciary activities or to any other activities within the business of banking." 68 Fed. Reg. 70,122, 70,129 (Dec. 17, 2003); 12 C.F.R. § 5.20(e)(1)(i) (2003). The regulation further provided that "[a] special purpose bank that conducts activities other than fiduciary activities must conduct at least one of the following three core banking functions: receiving deposits; paying checks; or lending money." *Id.* While the regulation erroneously suggested that another "core banking function[]" could substitute for "receiving deposits," it correctly recognized that a national bank must either limit its functions to fiduciary activities or engage in core

banking functions. The Final Rule at issue here amends this regulation, and vastly exceeds the OCC's authority to charter national banks.

**II. Regulation of Cryptocurrency**

42. In line with President Trump's "campaign promise" to "make America the crypto capital of the world," https://www.whitehouse.gov/fact-sheets/2025/07/fact-sheet-president-donald-j-trump-signs-genius-act-into-law/, the OCC has become dramatically more permissive in regulating crypto companies, including through the Final Rule. The OCC's new permissive approach allows crypto companies to compete with community banks, without having to comply with the fundamental legal safeguards and obligations of banks. That approach poses significant risks to consumers and the financial system, because crypto assets are highly volatile and vulnerable to cybercrime and fraud.

43. Crypto assets are digital stores of value that are not government-backed and operate using blockchain. Blockchain is a digital recordkeeping system for tracking transactions involving crypto assets. Blockchain is decentralized and distributed across many computers.

44. Crypto assets, including crypto currencies, can be traded, used as a medium of exchange, or used to store value. Bitcoin was the first, and is still the most common, cryptocurrency. Crypto assets are used both to facilitate financial services and as investment instruments. Crypto assets have no inherent value, and therefore their prices fluctuate dramatically. Stablecoins were created in an effort to solve the problem of

unstable cryptocurrency valuation. A stablecoin is a crypto asset whose value is pegged to and backed by another type of asset, such as cash or government securities. Stablecoins can also be pegged to other cryptocurrencies.

45. Crypto assets are both highly volatile and speculative. As a result, national trust banks that engage in crypto activities will be at increased risk for failure due to sudden changes in the value of crypto assets. Moreover, given the interlocking nature of our banking system, distress caused by a sharp change in the value of crypto assets could lead to the failure of other banking entities. For example, the failure of crypto exchange FTX led to a run, and the eventual failure or liquidation, of Silvergate Bank and Signature Banks, which were holding significant crypto-related deposits. Using the national trust charter to further integrate crypto assets into the banking system will dramatically increase the risks of financial instability and contagion.

46. In addition to financial instability, the decentralized nature of crypto assets also raises their risks of fraud, money laundering, and cybercrime. Since many cryptocurrencies lack a centralized issuer, these crypto assets cannot be reclaimed or clawed back like monies in traditional payment systems. For example, in 2025, the Federal Bureau of Investigation received more than 180,000 crypto fraud complaints totaling $11.4 billion, a more than 20% increase from 2024. Internet Crime Complaint Center, Federal Bureau of Investigation: Internet Crime Report 2025 at 7–8, 52 (Apr. 6, 2026), https://www.ic3.gov/AnnualReport/Reports/2025_IC3Report.pdf. The Financial Action Task Force estimated that illicit crypto finance losses reached as high as

$51 billion worldwide in 2024. Financial Action Task Force, Targeted Update on Implementation of the FATF Standards on Virtual Assets/and Virtual Asset Service Providers at 20 (June 2025), https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/2025-Targeted-Upate-VA-VASPs.pdf.coredownload.pdf.

47. Crypto companies also present significant national security risks because they are often targets for foreign agents to commit cyberattacks. For example, the United Nations Panel of Experts detailed investigations into 58 cyberattacks committed by North Korean agents against crypto companies between 2017 and 2023, costing more than $3 billion. Letter from Panel of Experts established pursuant to resolution 1874 to UN Security Council, S/2024/215, at 4, 60 (Mar. 7, 2024), https://docs.un.org/en/S/2024/215.

48. For many years, federal banking regulators recognized the risks posed by crypto, and therefore took a cautious approach. The OCC, however, took a dramatic turn under the first Trump Administration. It began to assert sweeping claims of authority to charter a new category of crypto trust banks that were neither depository nor fiduciary, yet could engage in wide-ranging banking activities.

49. At the end of the first Trump Administration, the OCC issued IL 1176. IL 1176, which was authored by then-Senior Deputy Comptroller and Chief Counsel Jonathan Gould, asserted that the last sentence of section 27(a) grants the OCC authority to charter as a national bank any company that engages in activities of "a trust company and activities related thereto." *Id.* at *1. IL 1176 further asserts that such companies engage

in "the business of banking," even if they do not accept deposits, and therefore, 12 U.S.C. § 24(Seventh) empowers them to engage in activities that are not authorized under section 92a. *Id*. at *4, 5.

50. In sum, IL 1176 took the position that the OCC has power to charter a new category of non-depository, non-fiduciary national trust banks. It further asserted that such "trust banks" could exercise (1) the fiduciary powers set forth in section 92a; (2) powers of a depository national bank and powers incidental to "the business of banking" under section 24(Seventh); and (3) all the powers of a state trust company, as well as any "activities related." *Id*. at *4.

51. This sweeping assertion of newfound power is wrong. It fundamentally misinterprets the statutes. It also violates the major questions doctrine, because it asserts vast economic powers without clear congressional authorization. Section 27(a) does not provide the OCC authority to charter non-depository, non-fiduciary companies as "trust banks," and such companies are not engaged in "the business of banking."

52. The issue remained largely dormant and untested for years. During the Biden administration, the OCC left IL 1176 in place, but stated it would not approve any charters under it unless the company could demonstrate "it has controls in place to conduct the activity in a safe and sound manner." Interpretive Letter No. 1179, 2021 WL 5783306, at *1 (Nov. 18, 2021) ("IL 1179"). The Biden Administration then did not approve any national trust bank charter for a crypto company or other non-depository, non-fiduciary company.

53. Between November 2021 and August 2023, the OCC and the other federal banking agencies assembled a supervisory framework that conditioned bank engagement with crypto assets on advance regulatory clearance and treated the sector primarily as a source of risk for the banking system. The issuances imposed some safeguards, including requiring a demonstration of adequate controls, and a dedicated heightened-supervision program. The agencies explained that those requirements were based on the risks of fraud, legal uncertainty, misleading disclosures including deposit-insurance misrepresentation, crypto-market volatility, stablecoin run risk, liquidity volatility in crypto-related and stablecoin-reserve deposits, sector contagion and concentration, and immature risk-management and governance practices. *See, e.g.*, OCC Bulletin 2023-8, Crypto-Assets: Joint Statement on Liquidity Risks to Banking Organizations Resulting from Crypto-Asset Market Vulnerabilities (Feb. 23, 2023), https://www.occ.gov/static/rescinded-bulletins/bulletin-2023-8.pdf; OCC Bulletin 2023-1, Crypto-Assets: Joint Statement on Crypto-Asset Risks to Banking Organizations (Jan. 3, 2023), https://www.occ.gov/static/rescinded-bulletins/bulletin-2023-1.pdf; IL 1179, 2021 WL 5783306, at *2-3.

54. This supervisory framework was quickly dismantled at the outset of the second Trump Administration, and replaced with positions far more accommodating to the crypto industry. The OCC acted quickest of all, rescinding all of the issuances by early March of 2025. This action included the unusual step of withdrawing unilaterally from

joint agency guidance. *See* OCC Interpretive Letter No. 1183, 2025 WL 1084146 (Mar. 7, 2025).

55. Separately, in 2025, Congress passed the Guiding and Establishing National Innovation for US Stablecoins Act ("GENIUS Act"), Pub. L. No. 119-27, 139 Stat. 419 (2025) (codified at 12 U.S.C. §§ 5901 *et seq.*). The GENIUS Act will provide a regulatory structure for certain companies issuing payment stablecoins, confirming that financial regulation of crypto companies is the type of major question Congress addresses. The GENIUS Act is not yet in effect, and also does not expressly authorize many of the activities that the OCC has already approved for crypto trust banks. The GENIUS Act does not amend section 27a or section 92a.

56. The GENIUS Act provides that issuers of "payment stablecoin[s]" must obtain federal permits. 12 U.S.C. § 5902. It defines a payment stablecoin as a digital asset that is used as a means of payment and is redeemable "for a fixed amount of monetary value," such as the U.S. dollar or a foreign national currency. *Id*. § 5901(22). It provides for three types of entities to become federal qualified stablecoin issuers: (1) uninsured national banks chartered by the OCC; (2) subsidiaries of insured depository institutions; and (3) nonbank entities. *Id*. § 5901(11)(A), (B), (23). To be a federal qualified stablecoin issuer, an entity must be approved by its primary federal regulatory agency, *id*. § 5904(a)(1), (c), under the agency's implementing regulations, *id*. §§ 5904(a)(2), 5913(a).

57. The GENIUS Act requires federal payment stablecoin regulators, including the OCC for certain entities, *id*. §§ 5901, 5913, to issue regulations imposing capital

requirements for stablecoin issuers, requiring stablecoin issuers to maintain reserves backing the stablecoins on at least a 1 to 1 basis, requiring reserve asset diversification, and requiring appropriate operational and compliance standards. *Id*. § 5903(a)(1)(A), (4)(A). The GENIUS Act does not provide for regulation of crypto company activities, other than issuing payment stablecoins that are redeemable for fixed amounts of money.

58. The GENIUS Act will not take effect until January 18, 2027, or 120 days after final regulations implementing the Act are promulgated, whichever is earlier. The OCC has not yet promulgated final regulations under the GENIUS Act.

59. Thus, the GENIUS Act could not cure any problem with the charters that the OCC has already issued, including Protego's approval.

**III. OCC approves Protego's national bank charter in violation of the APA.**

60. During the second Trump Administration, the OCC has been chartering non-fiduciary, non-depository crypto companies as trust banks. *See* News Release 2025-125, Office of the Comptroller of the Currency, OCC Announces Conditional Approvals for Five National Trust Bank Charter Applications (Dec. 12, 2025), https://occ.gov/news-issuances/news-releases/2025/nr-occ-2025-125.html.

61. Protego is a crypto company with a history of severe financial problems. After the OCC first conditionally approved Protego's application for a trust bank charter in 2021, the OCC never authorized the trust bank to open. The conditional approval expired in 2023, due to Protego's failure "'to ensure the safe and sound operation of the bank as well as meeting minimum capital and liquidity requirements.'" Leo Schwartz,

*Crypto bank Protego didn't meet all requirements for national trust charter, OCC says*, FORTUNE (Mar. 17, 2023), https://fortune.com/crypto/2023/03/17/crypto-bank-protego-didnt-meet-requirements-for-national-trust-charter-occ-says/. Protego's financing was highly concentrated in other crypto companies, and collapsed during a crash of the volatile crypto market in late 2022 and 2023. Several of Protego's investors, including FTX and Deltec Bank, were linked to money-laundering and cyberfraud. In 2023, Protego laid off more than half its workforce. Commercial vendors sued Protego for failure to pay its bills, and multiple default judgments were entered against it. Protego also sued one of its investors, Blackie Capital Inc., for failure to provide funding.

62. In May 2025, Protego applied to the OCC for a trust bank charter. According to the OCC's conditional approval letter, Protego will operate, in a non-fiduciary capacity, a custody platform, a trading platform, a lending/borrowing platform, and an issuer services platform. The trading platform will facilitate customers buying, selling, and exchanging their crypto assets. The lending/borrowing platform will connect customers who wish to lend crypto assets with other customers seeking to borrow them. The issuer services platform will facilitate the issuance of crypto assets by others. The OCC's conditional approval letter is explicit that these services—the central focus of Protego's business—will be provided in a non-fiduciary capacity, while only certain ancillary services would be provided as fiduciary. Ex. C at 1–2.

63. Several commenters, including ICBA, explained why the OCC should deny the application. As an initial matter, the application relied on IL 1176, which is contrary

to law because it was issued without the public notice and comment procedures that the APA requires, and exceeds the OCC's chartering authority for non-depository institutions. Protego's proposed activities are inconsistent with a national trust bank charter because they are primarily non-fiduciary activities, such as facilitating the lending and borrowing of crypto assets without investment discretion. The approval allows Protego to use essentially the same business model as a traditional bank, without having to comply with the same banking regulations, and without FDIC protections.

64. The comments also explained that Protego will face significant risks from cryptocurrency fraud, money laundering, and cybercrime. Particularly in light of the volatility and risks of cryptocurrencies, Protego appears to have insufficient capital and liquidity support. Further, the OCC's untested receivership framework would struggle to resolve an uninsured institution of Protego's proposed scale and operational complexity. The OCC itself has stated that its receivership regulation is not as protective of consumers as the FDIC's. Receiverships for Uninsured National Banks, 81 Fed. Reg. 92,594, 92,595 (Dec. 20, 2016). The failure of the trust bank could lead to an emergency federal bail-out, or "produce a deadweight loss" and "possible contagion" across the banking industry. Comments of Bank Policy Institute on National Digital Trust Company ["Protego"] Charter Application at 14 (Oct. 14, 2025), https://tinyurl.com/3c3sajb5. In addition, commenters explained that approval of the charter would undermine the separation of banking from general commerce, and create an unlevel playing field that

would harm traditional banks and limit their ability to serve the credit needs of their communities.

65. In February 2026, the OCC conditionally approved Protego's charter. In doing so, the OCC failed to address the concerns raised in comments. Instead, the OCC asserted that it is experienced in supervising and regulating national banks engaging in novel activities. The OCC also stated that it has a regulation that outlines the receivership process for uninsured national banks. The OCC failed to respond to concerns about the absence of liquidity standards, capital reserve requirements, or consumer protection. The OCC also failed to respond to concerns about the importance of the separation of banking from commerce, Protego's flawed risk structure, and concerns about creating an unequal playing field for traditional banks and potential harm to consumers.

66. The approval exceeds the OCC's statutory authority. There is no statutory basis for the OCC's position that it can charter crypto trust banks that are neither depository nor fiduciary. The OCC has the authority to grant national trust banks only those trust powers set forth in section 92a. The last sentence of section 27(a) clarifies that the OCC can limit a charter to the trust company and related activities set forth in section 92a; it does not override section 92a.

67. The approval is arbitrary and capricious because the OCC failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) (internal quotation omitted). The OCC did not "'adequately explain its result and respond to relevant and significant public comments.'" *Bloomberg L.P. v. SEC*, 45 F.4th 462, 476–77 (D.C. Cir. 2022) (citation omitted). The approval is also arbitrary and capricious because the OCC reversed its longstanding position without adequate explanation.

**IV. The Final Rule**

68. In January 2026, the OCC published a notice of proposed rulemaking. 91 Fed. Reg. 1098 (Jan. 12, 2026). The OCC proposed to amend its 2003 regulation, 12 C.F.R. § 5.20(e)(1), by changing its references to "fiduciary activities" to refer to the broader concept of "operations of a trust company and activities related thereto." *Id*. at 1099. Rather than stating that the OCC could charter a "special purpose bank that limits its activities to fiduciary activities," the proposed rule stated that the OCC could charter a "special purpose bank that limits its activities to the operations of a trust company and activities related thereto." *Id*. at 1101. And rather than stating that "[a] special purpose bank that conducts activities other than fiduciary activities must conduct" certain "core banking functions," the proposed rule states that "[a] special purpose bank that conducts activities other than the operations of a trust company and activities related thereto must conduct . . . core banking functions." *Id.*

69. As in IL 1176, the notice made clear that the OCC views "the operations of a trust company and activities related thereto" as being far broader than the fiduciary activities set forth in section 92a. The OCC asserts that it has authority to charter a

national "trust bank" that is not fiduciary, and also does not take deposits or engage in any other "core banking functions." *Id*. The OCC asserts its chartering authority extends to any company that engages in "operations of a trust company and activities related thereto" under state law. *Id*. And it claims that such a company can engage in the business of banking, exercise all powers incidental to the business of banking, and all powers of state trust companies, without being a depository bank subject to the Federal Deposit Insurance Act ("FDIA") and the BHCA.

70. ICBA and others filed comments explaining that the proposed rule exceeds the OCC's statutory authority and poses grave public policy problems. Comments of Independent Community Bankers of America at 1–9 (Feb. 11, 2026), Dkt. No. OCC-2025-0768-0020, https://www.regulations.gov/comment/OCC-2025-0768-0020; Comments of Americans for Financial Reform Education Fund at 5–6 (Feb. 11, 2026), Dkt. No. OCC-2025-0768-0022, https://www.regulations.gov/comment/OCC-2025-0768-0022; Comments of the Conference of State Bank Supervisors at 3 (Feb. 11, 2026), Dkt. No. OCC-2025-0768-0012, https://www.regulations.gov/comment/OCC-2025-0768-0012; Comments of Better Markets at 4–5 (Feb. 11, 2026), Dkt. No. OCC-2025-0768-0011, https://www.regulations.gov/comment/OCC-2025-0768-0011.

71. Commenters explained that the proposed rule is unlawful because it exceeds the OCC's statutory authority. The proposed rule rests on the OCC's assertion that the last sentence of section 27(a) provides it authority to charter non-fiduciary, non-depository trust banks. The OCC misreads the statute, contrary to the holding of the

Third Circuit. *Nat'l State Bank of Elizabeth*, 591 F.2d at 231. Section 92a governs the permitted activities of trust banks, and it applies only to fiduciary institutions. The last sentence of section 27(a) clarifies that a trust bank "is not illegally constituted solely because its operations are . . . limited to those of a trust company"; thus, trust banks do not have to take deposits or engage in other banking activities. 12 U.S.C. § 27(a). But it does not authorize the OCC to charter national trust banks engaging in non-fiduciary activities of state trust companies beyond the scope of section 92a. Further, non-depository trust banks cannot exercise "incidental powers as shall be necessary to carry on the business of banking" under section 24(Seventh) because they are not engaged in the business of banking.

72. The OCC's contrary position creates a new category of non-fiduciary, non-depository national banks that do not fit within section 27(a). It opens a vast regulatory loophole, allowing crypto companies to fill many of the same functions as community banks, while evading the fundamental safeguards, obligations, and oversight of those banks. For example, crypto trust banks are not required to obtain deposit insurance under the FDIA. They are also exempt from important BHCA requirements, such as the requirement to separate banking from general commercial activity and consolidated supervision of their parent companies from the Board of Governors of the Federal Reserve System. Further, these crypto trust banks are exempt from other requirements that apply to community banks, including the enhanced prudential standards under the Dodd-Frank Act, 12 U.S.C. § 5365; the statutory prompt corrective action framework, *id.*

§ 1831o; and the statutory restrictions on transactions with hedge funds and other risky investment vehicles ("Volcker Rule"), *id.* § 1851. At the same time, their charter as national banks exempts them from many state regulations, including certain state consumer protection laws.

73. Commenters explained that the proposed rule will therefore create regulatory arbitrage and undermine competition. Chartering crypto trust banks endangers community banks and the services they provide to local communities. As national trust banks, crypto companies can offer many services similar to community banks, allowing them to compete with those banks. And because crypto trust banks are not subject to the same costly regulatory requirements as community banks, they will have lower operational costs. This exemption from federal regulation puts community banks at an unfair disadvantage, contrary to the NBA's intent to create competitive equality and its longstanding policy of supporting a dual banking system. The loss of significant deposits in community banks will reduce the funds available for these banks, which have a proven commitment to their communities, for example by making loans to local small businesses and farmers.

74. The proposed rule also endangers consumers who lack the protections of federal law, including deposit insurance and other federal regulatory requirements. Customers will reasonably assume that a company having "national bank" in its title is an insured depository institution subject to the same regulatory safeguards that apply to community banks. These customers, however, would not have deposit insurance or other

federal regulatory safeguards. They also will not be protected by some state consumer protection or other laws, because those statutes are preempted for nationally chartered banks. *See id*. §§ 25b(b)(1)(B), 85; 12 C.F.R. § 7.5002(c).

75. In addition, commenters explained that the OCC's receivership structure is not equipped to handle the significant risk presented by crypto companies. Cryptocurrencies are volatile, and crypto companies frequently become insolvent. Any bank failure poses challenges, but the FDIC's resolution framework for insured banks at least has been well-tested. By contrast, the OCC has not managed an uninsured bank receivership in nearly one hundred years. 81 Fed. Reg. at 92,595. Even the OCC acknowledged in the preamble to its receivership regulation that it provides less protection for consumers than the FDIA receivership statute. *Id.*

76. A few weeks after the comment period closed, the OCC issued the Final Rule without making any changes. 91 Fed. Reg. 9977 (Mar. 2, 2026). The OCC provided only a two-page response to the significant issues commenters raised. The OCC contended that the final sentence of section 27(a) gives it authority to charter any company engaging in "operations . . . of a trust company and activities related thereto" as a national bank. *Id*. at 9979. It contended that this authority is not limited to the fiduciary operations authorized under section 92a, because section 27(a) refers to "trust" operations, and '"trust' and 'fiduciary' must mean different things in the federal banking statutes." *Id*. It refused to follow the Third Circuit's interpretation in *National State Bank of Elizabeth*, contending that it was "dicta." *Id*. It further contended that non-depository

trust banks can "engage in the business of banking" and exercise the incidental powers set forth in section 24(Seventh). *Id*. at 9979–80.

77. The OCC denied that it was making any substantive change to the regulation or to its "long-held interpretation and historical practice," asserting that national trust banks have not exclusively engaged in solely fiduciary activities. *Id*. at 9978. The OCC contended that it was merely clarifying the rule to avoid a "mistaken[]" interpretation "circumscrib[ing] national trust bank activities." *Id*. The OCC also stated that it would not address "whether there is any required quantum of fiduciary activities" for a trust bank or the "various policy concerns" commenters raised. *Id*. at 9980. It stated that these issues were "outside of the scope of this rulemaking" and that it would address them in its "review of applications." *Id*.

78. The Final Rule exceeds the OCC's statutory authority. The NBA does not give the OCC the authority to charter national banks that are neither depository nor fiduciary. By its terms as well as statutory context, the last sentence of section 27(a) clarifies that the OCC can "limit[]" its charters to authorize only "operations . . . of a trust company and activities related thereto" under section 92a, without authorizing the company to engage in the business of banking. 12 U.S.C. § 27. And section 92a provides the OCC authority to permit national banks to engage in the *fiduciary* activities of trust companies and related activities. *Id*. § 92a.

79. The Final Rule also exceeds the OCC's statutory authority because it declares that non-depository trust banks engage in the business of banking and can

exercise powers incidental to the business of banking under section 24(Seventh). Under the NBA, however, a bank must at least take deposits to be in the business of banking.

80. The Final Rule is also arbitrary and capricious because the OCC failed to "respond to relevant and significant public comments." *Bloomberg L.P.*, 45 F.4th at 476–77. In its two-page response to public comments, the OCC failed to address a host of significant issues commenters raised. *See* 91 Fed. Reg. at 9978–80. Those issues include, among other things, that the Final Rule erroneously allows trust banks to engage in non-fiduciary activities without becoming insured banks under the FDIA and without being subject to significant federal regulatory requirements under the FDIA and the BHCA. Thus, the Final Rule allows crypto companies to compete with community banks without having to comply with the same regulatory safeguards. The Final Rule also fails to address the risks that chartering crypto trust banks pose to the financial system as a whole, including by diverting deposits from community banks; causing less money to be available for lending; forcing community banks to compete on an unequal playing field; and intertwining the banking industry with crypto companies that have a track record of instability, insolvency, and vulnerability to fraud, money laundering, and cyberattacks.

81. The OCC also fails to address the potential consumer confusion that will result from labeling uninsured crypto companies as "national banks" when they are not insured, and not subject to federal regulations that govern traditional banks. In addition, the OCC fails to address whether its receivership process, which has not been used in nearly one hundred years, would be able to handle the failure of a crypto trust bank.

These are significant problems to which the OCC was required to provide a reasoned response, rather than simply dismissing them as "beyond the scope" of its rulemaking.

82. The Final Rule is also arbitrary and capricious because the OCC fails to recognize a change in agency position and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Nowhere does the OCC acknowledge that it is changing its prior rule, and departing from its longstanding interpretation that its authority to charter trust banks is tethered to section 92a fiduciary activities. To the contrary, the OCC wrongly asserts that its new rule is not a substantive change at all, even though it will vastly broaden the scope of its purported chartering authority. And the OCC fails to provide any reasons to support its new policy of allowing trust banks to engage—perhaps exclusively—in extensive non-fiduciary activities.

## CLAIMS FOR RELIEF

### COUNT I:
### Final Rule—Violation of the National Bank Act, 12 U.S.C. § 92a, and the Administrative Procedure Act.

83. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

84. Under the APA, a court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).

85. The Final Rule exceeds the OCC's statutory authority, and therefore violates the APA, the NBA, and 12 U.S.C. § 92a. The NBA does not give the OCC statutory

authority to charter national banks that are neither depository nor fiduciary. The major questions doctrine further supports this reading. The Final Rule purports to find sweeping new statutory authority in an old statute that has not been interpreted to provide such authority. *See West Virginia v. EPA*, 597 U.S. 697, 724 (2022). Congress subsequently and more specifically spoke to the regulation of crypto companies in the GENIUS Act, further indicating that it is an important issue that Congress intends to address itself and did not delegate to the OCC in the NBA. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), *superseded by statute*, Family Smoking Prevention and Tobacco Control Act of 2009, 123 Stat. 1776, *as recognized in Food & Drug Admin. v. Wages & White Lion Invs.*, 604 U.S. 542, 551 (2025). Such sweeping power requires clear congressional authorization, which is lacking here.

86. The Final Rule is also arbitrary and capricious, because it fails to meaningfully respond to comments concerning the dangers it will create for the financial system, and the harms it will cause to competitors and consumers. In addition, when an agency changes its position, it must at a minimum acknowledge that it is changing its position and "show that there are good reasons for the new policy." *Fox Television Stations*, 556 U.S. at 515. The Final Rule fails to meet these requirements, and instead erroneously denies that it is changing the prior rule.

**COUNT II:**
**IL 1176—Violation of the National Bank Act, 12 U.S.C. § 92a, and the Administrative Procedure Act**

87. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

88. IL 1176 is in excess of the OCC's statutory authority, and thus, violates the APA because the OCC lacks statutory authority under the NBA to charter banks that are neither depository nor fiduciary. The major questions doctrine further supports this reading. Such sweeping power requires clear congressional authorization, which is lacking here.

89. IL 1176 also violates the APA because it was issued without notice and opportunity for public comment as required under 5 U.S.C. § 553. IL 1176 is a "rule" under the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," *id.* § 551(4), and thus, was required to go through notice-and-comment rulemaking.

**COUNT III:**
**Protego's Approval—Violation of the National Bank Act, 12 U.S.C. § 92a, and the Administrative Procedure Act.**

90. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

91. The OCC's approval of Protego's charter is in excess of the OCC's statutory authority, and thus, violates the APA because it authorizes Protego to operate as a national bank even though Protego is not engaged in the business of banking and engages

in extensive activities unrelated to the fiduciary operations set forth in section 92a. The last sentence of section 27(a) does not provide authority for the OCC to charter crypto trust banks that are neither depository nor fiduciary.

92. Because the OCC lacked statutory authority to charter Protego to operate a national trust bank, Protego's charter approval is in excess of statutory authority in violation of the NBA, 12 U.S.C. § 92a, and the APA. Protego's charter is also invalid because it relies on IL 1176, which exceeds the OCC's statutory authority and was issued without the public notice and comment the APA requires.

93. The approval is also arbitrary and capricious in violation of the APA because the OCC failed to consider important aspects of the problem that commenters raised. Among other things, the OCC failed to address comments concerning the dangers the approval will create for the financial system, the harms it will cause to competitors and consumers, and the importance of the separation of banking and commerce.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff asks this Court to enter an order and judgment:

1. Declaring and holding unlawful the Final Rule;

2. Vacating and setting aside the Final Rule in its entirety;

3. Enjoining Defendants (including their officers, agents, employees, assigns, and all persons acting in concert or participating with them) from using the Final Rule, or the policy announced therein, to grant or conditionally approve any charter;

4. Declaring and holding unlawful IL 1176;

5. Vacating and setting aside IL 1176 in its entirety;

6. Enjoining Defendants (including their officers, agents, employees, assigns, and all persons acting in concert or participating with them) from using IL 1176, or the policy announced therein, to grant or conditionally approve any charter;

7. Declaring and holding unlawful Protego's approval;

8. Vacating and setting aside Protego's approval;

9. Awarding Plaintiff costs and attorney fees pursuant to any applicable statute or authority; and

10. Awarding Plaintiff such additional relief, including equitable injunctive relief, as the Court deems appropriate.

Dated: October 2, 2026

Respectfully submitted,

/s/ Elbert Lin
Elbert Lin, D.C. Bar No. 979723
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Phone: (804) 788-7202
elin@Hunton.com

Erika L. Maley, D.C. Bar No. 1008714
Erica N. Peterson, D.C. Bar No. 1686244
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 955-1500
emaley@Hunton.com
epeterson@Hunton.com

*Counsel for Plaintiff Independent Community Bankers of America*